The next case today is Gerald Alston v. Town of Brookline, MA at all, appeal number 201434. Attorney Ames, please introduce yourself for the record. May I please the court, Brooks Ames representing Gerald Alston. May I reserve two minutes for rebuttal? Two, yes. The question for the court is whether Gerald Alston, a veteran firefighter terminated by the Town of Brookline, who has since been reinstated to his position by the Massachusetts Civil Service Commission and the Massachusetts Superior Court, has established trial worthy claims of racial discrimination under the Equal Protection Clause and retaliation under the First Amendment in the District Court ruled Alston failed to present competent evidence challenging Brookline's account of his termination. The District Court applying the familiar McDonnell-Douglas framework ruled effectively that it was undisputed that Brookline officials had acted in good faith and for legitimate non-discriminatory or retaliatory reasons in terminating Alston and that no reasonable jury could find otherwise. The District Court erred in that finding. Mr. Ames, this is a really complicated case so I'm going to try to move us along. Let's assume, please, that the District Court's non-mutual collateral estoppel ruling is wrong. Let's just take that as a hypothetical and that the earlier actions do not preclude a suit against individuals. Before we get to whether there is a trial worthy issue of fact, I would just like to go through each of the categories of the defendants. As to the union, they argue that events before December 1, 2012 are time-barred. Do you agree with that? No, Your Honor. All right. As to the events after December 2012, which has to do with the leave being painted on the fire trucks in 2013 and the events leading up to the As to the union, which says, look, we really weren't involved and we weren't asked to be involved. Why do you think you have a claim against them? These are not questions of disputes of material fact. These are basic, have you alleged enough facts about union involvement to keep them in the case. Okay? With regards to the union, the core allegation is the union betrayed its duty to protect Mr. Alston from discrimination within the union. And that included discrimination that took place on the union blog, which the union controlled. So initially, it was a retaliatory act by Joseph Caney, who record show was the Facebook blog early after Mr. Alston was referred to as the N-word by his lieutenant. This Joseph Caney, vice president of the union, put on the union blog that Firefighter Alston was a faceless coward and that his claims were meritless. Mr. Ames, that assumes that you're correct that the pre-2012 December events are time barred. Let's assume you're wrong about that. Okay. What is the claim against the union? And then I have other defendants I want to get to. Okay. What's the claim against the union thereafter? The next claim against the union is that in connection with the leave incident that your honor noted, the union actively worked against Firefighter Alston and tried to get the town to essentially declare him as dangerous by putting police cars at every fire station and by having the town execute a stay away order against him. Okay, fine. Excuse me. I've got it. I'm just trying to understand these things. All right. Let's move on to the individual Brookline defendants sued in their individual capacity. Okay. There is no claim under section 1981 against individuals. Agreed? Yes. Okay, so that drops out. Okay. As to the 1985 claims, they say you didn't brief it, you've waived it. Can we agree on that? Well, in so far as we're alleging a conspiracy between the individual defendants, no, but I think that that would be supported under 1983 anyway, as a joint act. So all we're talking about are the 1983 claims, putting aside the speech claims against the individual defendants. What's the guts of your case as to the 1983 claims as to the individuals? The guts of that claim are what the commission found, which was that the individual... Summarize it for me, please. We don't have a lot of time. The individual defendants had an obligation to repair the breach caused by Lieutenant Pender's use of the N-word. That breach created a dangerous situation in the fire department because firefighters have to depend on each other for their safety when they do life-threatening tasks. Okay, I've got it. How about the retaliation for the exercise of speech against the individual town defendants? The retaliation is terminating Mr. Alston. The retaliation is terminating his two occasions. That is effectively the retaliation. Okay, and they say, look, we relied on outside expert psychologists who basically said in order for him to be able to return to work, he's got to comply with certain conditions and he didn't comply. So it's a sort of ground-healthy type defense on your First Amendment claims that would also work on the 1983 claims. What's your response? The response is that the individual defendants presented a misleading picture to the experts by failing to disclose to the experts relevant information that affected whether Firefighter Alston could safely return to work, including documents that demonstrated that they, in their individual capacities, dealing with the experts presented misleading information, as opposed to whatever the town did in its official capacity. What evidence do you have of that? The evidence is that they condoned the action of presenting a limited... No, no, counsel, I think you may be missing Judge Lynch's point, all right? There may be evidence, the evidence to which you point may indicate that certain action or inaction occurred by the individual defendants in their individual capacities, but what, in their official capacities, but what with respect to the expert, taken as individuals and not as representatives or officials of the town? Let me try out an answer to that, which may not be satisfactory to you, but with regards to the individuals, they're obviously acting and perceiving information because of their position in the town, but that doesn't mean that they didn't obtain that information, and the example I'm thinking of is that the individual's defendants invited Paul Pender, the lieutenant who had left the racial slur on Mr. Alston's voicemail, to a meeting so that Lieutenant Pender could plead his case, and in the course of that meeting, it became quite apparent that Lieutenant Pender was not remorseful for his actions. In fact, he was resentful and had a grievance against Mr. Alston. That was information that the individual defendants knew because they were getting it firsthand from Paul Pender, but then they rely, in terminating Mr. Alston, on a narrative that Firefighter Alston has not been able to move on from the incident and that Pender has repeatedly expressed remorse. So, these are parts of the record that show that the experts didn't have the full picture. Okay, I think we understand the theory, whether it's adequate is another matter. As to the Brookline selectmen in their official capacities, so their first defense is there's no municipal policy or custom, and furthermore, there is no causal link between any such policy or custom, and that lets them out. What's your response to that? The response to that is under the Supreme Court precedent in a number of decisions, including Pembauer, an action by a policymaker is a de facto policy. So, when the selectmen, or it's now the select board... Okay, suppose we disagree with that. What is the policy or custom adopted by Brookline, which caused the various problems, which your client admittedly suffered from? Well, the policy would be... It is not the case that simply because somebody can enact policy that they are acting as policymakers for a city or a town. So, what is the policy or custom that was involved here? Well, the policy is protecting a unrepentant racist, and not taking the breach caused by racism seriously, and not repairing it, which they had a duty to do. Okay, then they say you've got to have some comparators to show differential treatment, and none of your comparators are in fact comparators. Well, with regards to comparators and equal protection, it seems to me the entire purpose of the Equal Protection Clause was to protect black people from discrimination by the state. Counsel, that doesn't help. Give us some names. Who are the precise comparators, and what's wrong with the argument that they are not really comparators? Believe me, this court knows what the Equal Protection Clause is about. We don't need lectures on that. Thank you, Your Honor. There is not going to be a comparator, because there is no word in the English language that is comparable to the N-word, as applies to white people. So, there is not going to be a white person who was called some slur, who was allowed to return to work without conditions, or who was treated better than Mr. Alston under similar circumstances. Okay, so you're saying as to white comparators, the comparator test is simply wrong, okay? What about other minorities? Is there any evidence of other minorities differentially treated after they have been called racial slurs? You mean in the same fashion as Mr. Alston? Yes. Yeah. There's evidence in the record that a black police officer was terminated after being called the N-word. And the name of that officer? Prentice Pilot. Okay, thank you. Okay, sorry, I've interrupted your argument. I think you have a few minutes left, if you'd like to finish on anything else. Well, I think what I'd like to stress is that there are material issues of fact that the commission decided in Mr. Alston's favor, and that if a jury credited the commission's decision, which it could, then they could find in Mr. Alston's favor. That assumes, of course, that the commission decision is admissible. Is that correct? Yes, it does. Because, excuse me, as I understand the record, and I haven't yet looked at it because it's compendious, that what was before the district court was the commission decision, not the underlying commission record. Is that correct? That's correct in the sense that I submitted primarily the 83-page report of the commission, and not the underlying record. The town, in response to my submission, our submission of the report, submitted the vast majority of the administrative record. But the argument is that this court, in Davignon v. Hodgson, said that commission reports, such as the one in this case, are admissible evidence under the hearsay exception in the federal rules, and that this report qualified under those rules to be admissible, and that the district court judge failed in not taking into account the facts that were presented to the commission, and the facts that were found by the commission, and that a jury that credited those facts, or found those facts independently, would be entitled to find that Mr. Alston was discriminated against on the basis of his race, and that the district court judge failed to press the issue of racial discrimination in the town of Brookline. All right, so you're not arguing that the Civil Service Commission finding itself precludes the defendants from making their arguments. You are merely arguing that it is evidence that the district court should have considered, did not consider, and if it had considered it, it would have understood that there are material issues remaining in the case that could be decided in your client's favor. Have I got it? Yes, Your Honor. Particularly the question of bad faith, which is a stand-in for pretext, which is typically what you have to show in order to get the jury's... No, I'm sorry, you lost me there. Why is bad faith a stand-in for pretext? One can have a legitimate reason to terminate employment. One can, in bad faith, decide that you're going to rely on that reason because you want to get rid of somebody. But that does not make the reason pretextual. You have some case that says pretext equals bad faith, and that following that, a civil service use of the term bad faith is the equivalent of the federal question of pretext. Well, I don't have a case, but in both cases, Your Honor, it's really a question of credibility that is usually left to the jury to determine whether or not the reasons given for an action were the true reasons. In the case of the Civil Service Commission, they had an opportunity to look the decision-makers in the eye and make a determination as to whether or not they were credible when they said that they had been acting in good faith, essentially, and trying to bring Firefighter Alston back to work. If they're not acting in good faith, that means they're being disingenuous about their underlying motivations. And that allows the jury to infer that the real reason is what Mr. Alston is alleging, which is that they were acting in retaliation. Okay, and that's against the town and official capacity selectment, correct? Yes, but it's the same officials as individuals who are making the decisions. Okay, and what about the union? The union did not terminate your client. No, no. But the union failed to protect Mr. Alston, and the union also participated in retaliation against Mr. Alston. And I'll just refer back to the leave incident in which the union lobbied over the fire chief had determined that this was not a situation that required police attention. The fire chief was able to go, the union was able to go over the fire chief's head to the town of Brookline and was able to get a stay-away order. The union then purported to represent Firefighter Alston at a disciplinary hearing, a disciplinary hearing which laid down all the conditions that led to his termination, and didn't defend him at that hearing, and didn't grieve that hearing, even though Firefighter Alston expressed dissatisfaction with the result of that. Okay, I have that, but what does that have to do with this sort of Mount Healthy defense? The union is not responsible for the expert psychiatric reports. No. Well, the union is not responsible for the reports, but the union did not ensure that Firefighter Alston had due process in connection with the preparation of those reports, how many years back the doctors were looking at medical records and such. Okay, got it. Did your client request union intervention at that point? As I read the union brief, they say he didn't. They say he didn't, and we think that there's a dispute, a material dispute of fact over what in this particular fire union was required to get the union to start Again, that's too general. Is there any evidence that your client requested union intervention as to the materials that were to be provided to the expert psychiatrists who look at him and say before he comes back to work, he ought to comply with these requirements? The evidence is that at the hearing where the expert's report was presented to Mr. Alston in the union, Mr. Alston expressed dissatisfaction with the outcome and the union was silent, although it was reportedly representing him, took no action. Okay, thank you. Attorney Ames, at this time, you can mute your device. Yeah, you have two minutes rebuttal later, okay? And so, Attorney Ames, you can mute your audio and video at this time, and Attorney Podolsky, if you could introduce yourself for the record. Good morning, Your Honors. Joseph Podolsky. May it please the Court, I'll be speaking on behalf of the Town of Brookline, the individual select board members in their official and individual capacities, and Town Council Jocelyn Murphy and HR Director Sandra Dubow. If I may proceed? Please. Thank you, Your Honor. Your Honor addressed a few of the perfunctory points I was going to make, and there are a few others that I wish to raise. First is the appellant appears to concede a claim preclusion ruling of the lower court as against the Town, and the appellant admits that he did not argue issue preclusion applied to the Civil Service Commission before the lower court. There are four main points that I'd like to make in oral argument today. First is the appellant has not offered specific and competent factual support for the premise that underlies his entire case. That is, he was subjected to a hostile work environment under the prescripts of the law. Two points to highlight this issue for today. First is that this Court's cases all hold, and the cases I'm specifically referring to are Forrest v. Brinker, Wilson v. Mollison, North Corporation, which is a case with a particularly nasty set of facts, Espinal v. National Grid Holdings. Those cases hold that employer defendants, such as the town defendants in this case, would be liable if they knew of discrimination and failed to take prompt and appropriate remedial action. In those cases, prompt and appropriate remedial action was an investigation, a verbal warning, a written reprimand, and in one of the cases, termination for the bad actor's third strike, which included both a slur and physical harassment. Here, the town defendants investigated, disciplined the bad actor with a two-week suspension, anger management, sensitivity training, mandatory mediation, and immediate transfer. The chief at the time, Peter Skerry, warned all of the workers, no retaliation. The town enlisted the assistance of the MCAD to come in and train the entire town workforce on anti-discrimination and bias training. The town enacted a town-wide zero-tolerance anti-discrimination policy. One of the appellant's arguments is that Lieutenant Pender, the bad actor in this case, was not told, as in the other cases, that he would be fired. The entire department was told there was zero tolerance for anti-discrimination when the town issued to every member of the workforce, including the fire department, the anti-discrimination policy that said there's zero tolerance for discrimination. These are acts that took place prior to the Norfolk Superior Court case and judgment, but the Norfolk Superior Court case and judgment speaks to this point as well, and I'll get into that more in a second. The second main point that I'd like to make for today is the undisputed evidence, and the evidence truly is undisputed. The statement of facts, which are in the appendix before you, before the court, is largely, almost completely, undisputed by the appellant. The undisputed evidence of the town defendant's legitimate and non-discriminatory reasons regarding the discrete actions, the discrete adverse actions taken in this case, is also undisputed proof that the adverse actions were not a pretext for discrimination. So, it touches upon two elements of the McDonnell-Douglas test, and it touches upon the Mount Healthy defense as well. Specifically...  Yes, Your Honor. So, specifically, December 19th and 22nd, 2013, the appellant admits he made shooting statements to his colleagues in the workplace, and then told the chief when the chief came in to meet with him that same day, that he too could get caught in the crossfire. The chief then, hence, placed him on leave pending psychological evaluation by an independent medical professional. And the appellant agreed that that was the appropriate action, and that he felt it was necessary as well. That evidence goes to the second prong of the McDonnell-Douglas, the second and third prong of the McDonnell-Douglas test, and the Mount Healthy line of precedent. We frequently skip the prima facie test and get to pretext. If you're familiar with our case law, you see that we do that all the time. That's why I'm trying to direct you. I understand, Your Honor, and I only mention it because the specific factual defense applies to both tests, the pretext test and the Mount Healthy test. And on May 14th, when the chief issued to the appellant the two-day suspension that you spoke about with my brother counsel, and conditioned his return to work, it was conditioned upon Dr. Brown's evaluations. He did two evaluations. The conditions were regular treatment, release for the occupational health nurse to monitor that treatment, completion of an anger management course, satisfactory passing of a fitness for duty evaluation, and random drug testing because of the cocaine and marijuana found in the appellant's system on multiple occasions over the course of years. Chief Ford also advised the appellant that he was no longer under investigation, that his administrative leave would end, and he would be carried on sick leave. That goes to the Mount Healthy defense. The appellant agreed in testimony that the chief's actions were not discriminatory or retaliatory. No appeal was taken. Appellant placed his blame with the union. I'll leave the union to argue to that on the union side of things. But the appellant could have filed an appeal to the Civil Service Commission without the help of the union. He didn't do so. An Amtrak versus Morgan, another Supreme Court case, speaks to such a failure to grieve discreet acts. Further, there was no second MCAT case filed. The record also shows that the appellant began to comply with the chief's conditions. It wasn't until November 2014, when he retained his current counsel, that he began to refuse the chief's conditions, and he sought to revive the Norfolk Superior Court case, which brings me to my third point. The Norfolk Superior Court case, and this is the third main point, and judgment is applicable in more than one way. The first is that the town answered and defended the claims, engaged in substantial discovery, and the court entered a judgment against him as a sanction for his refusal to provide answers to interrogatories, very specifically refusing to provide specifics. The who, the what, the when of his hostile work environment claims. When the court compelled him to do so, he still refused. The case law, Treglia versus McDonald, an SJC case, says such dismissals are with prejudice on the merits. The rules of procedure, in fact, Mass Rules of Civil Procedure Rule 41 codifies that. Such sanctions are dismissals with prejudice on the merits. But the second point is that it goes to the Mollison versus Northcorp holding, which is that notice must be provided, and in this case, not only was it not provided, but he was refusing court orders compelling him to provide that information. The second sub point that I'd like to make on this point is that this undercuts the reliability of the Civil Service Commission decision. The commission expressly rejects the Norfolk judgment, sets it aside. Not only does it set it aside, but it uses these so-called shunning instances, the details of which were first provided in 2019 before the commission, to make unqualified medical findings as distressors and hold them against the town. Counsel, do you have an argument that the ultimate loss of employment, independently of what the Civil Service Commission did and independently of what the Superior Court did, is a Mount Healthy situation because of the town's reliance ultimately on these reports? Are you making such an argument? Yes, Your Honor, I am. Get to it. On behalf of the town and the individual defendants. Thank you, Your Honor. The decision that the five factors were put in place based upon Dr. Brown's independent medical advice in the early part of 2014, Chief Ford put those discrete decisions in place, those orders in place in May of 2014, and the appellant accepted those or appeared to accept those conditions. When he was going back to the fitness for duty evaluation with Dr. Brown. That's time. If I may, Your Honor. Bring us up to the termination in 2016 quickly. So he objected to Dr. Brown and the town went and got Dr. Price. Dr. Price evaluated the plaintiff, gave him a full and fair opportunity to provide whatever information he wanted to provide and issued a decision with three very similar conditions, all of which he rejected. But there was no claim and there was no finding that Dr. Price was tainted in any way by any of the individual defendants or the town or with any sort of intent to discriminate. That is was the basis for the termination. Essentially, almost a year and a half later, at the end of 2016, that there were repeated opportunities to attempt to engage the plaintiff and his counsel. The town enlisted the assistance of Juan Cofield, the head of the New England chapter of the NAACP, Charles Walker, the former chair of the Massachusetts Commission Against Discrimination, the chief, the subsequent, the chief successor. The town enlisted the MCAD again to do refresher training. The town conducted a race climate review of the entire department, invited the appellant's assistance. What does that have to do with the expert's final decision? You're relying on Dr. Price's decision, are you not? Yes, Your Honor, that ultimately has to do with the third prong of the doctor's decision, which is for the appellant to suggest to the town what reasonable accommodations he may want for his return. And he made no such suggestions. And yet the town took all of these steps to to show to him that it was serious about eradicating race, discrimination and employment. And ultimately, when he continued to not speak to various town officials, not get back to them, not show up to appointments, to meetings, ultimately a hearing was scheduled before another independent hearing officer, James Lamke, who heard the facts and evidence, gave the appellant an opportunity to testify, to present whatever evidence in any form he wished to present. And he presented nothing. He his counsel read a statement and that was it. And so the opportunity to present this evidence was there and he presented nothing. And so the hearing officer made a finding that relied upon Dr. Price's report. And that is what the select board voted upon. So your Mount Healthy defense has two prongs. One is Dr. Price and the other is the civil service hearing officer who reached in his own conclusion. Is that correct? That would be part of it. Yes, Your Honor. Do you have anything else to add? Just one thing, Your Honor. I'd like to distinguish Davignon. I know my brother raised it, if I may. Davignon, my brother, relies on this as as as a case that says that agency decisions are admissible, but doesn't analyze that that point that Davignon says. Sure, they are. They could be admissible evidence. But really, it's an it's an abusive discretion and review case that this court engaged in, saying that whether or not it was an abuse of the trial court's discretion in that case to admit mass labor relations commission decision before the jury. And this court said, no, reviews for abuse of discretion are reversed only in rare circumstances that it could be admitted, admitted, but that the jury was not likely to put a lot of weight on it because it was an agency finding. This court distinguished 150 E and the First Amendment claims that issue in that and in that case, and essentially said as a matter of abuse of discretion, we're not going to find that here. But Judge O'Toole's decision, his sound decision on the admissibility of the Civil Service Commission's decision in this case, was a sound and correct decision. The commission's decision is not trustworthy. It's unreliable. The plaintiff intends to rely on the conclusions of the commissioner, not the findings. The findings of fact, the underlying base facts of the commission decision, all the testimony, all of the documents, those those were largely submitted to Judge O'Toole in the lower court's record. And so we had, he had those facts when he came to the conclusion that neither the town nor the individuals involved in this case, violated either the equal protection clause of the 14th Amendment or the First Amendment and retaliated against the appellant. What about you? Councilor, just a quick, just very quickly. The whole issue of the non-cooperation agreements, you haven't briefed that at all. Is there anything you want to say about that? The public policy argument? Your Honor, I believe it was, it was briefed in the town's, in the town brief. So the town submitted a brief and the individuals submitted a brief. The individuals incorporated the town's arguments by reference. The main the main argument is that the appellant waived that argument in in the lower court and failed to raise it. But beyond that, the EEOC case that is cited, I think, breaks down the elements of what is a settlement agreement that violates public policy. And in that case, the very specific agreements that the court said could violate public policy said no cooperation. You can't speak to claimants that were filing charges. You can't file charges yourself. Basically, we're completely silencing the civil rights claimants who had who had agreed to settlements in that EEOC case that's cited in the papers. Here, the plaintiff, the plaintiff, first off, had the entire record. I think I've got you. So the distinct, so it's waiver and distinguishable agreements. And the main point is the plaintiff never even tried to seek discovery from these three individuals that he's he's trying to invalidate their settlement agreements.  Thank you, Your Honor. Attorney Podolsky, you can mute your device at this time. Attorney Becker, if you could unmute your device and introduce yourself on the record. You have four minutes. May I please the court, John Becker, representing Local 950 of the International Association of Firefighters, the union in this case. I'm here on behalf of the union. And we believe that the court below correctly decided that the 1983 action should be dismissed because there was no state action. The union is not a state actor. The 1985 claim should be dismissed because there is no evidence of a conspiracy with the town. As a matter of fact, the court pointed out that there's actually quite an adversarial relationship with the town, even with regard to certain specifics in this case. And finally, the 1981 claim, the lower court correctly found that the statute of limitations bars any allegations prior to December of 2012, which leaves us really with the leave incident and the following issues having to do with the Mr. Most of which, as you can see from the record, the union was not involved in. The union was really out of the loop in much of this case. Mr. Alston, for whatever reason, chose not to invoke the union's grievance procedures. He did not ask for help from the union. And that's really what distinguishes his case from the comparator cases that the. Those were people who came to the union, who asked the union to help them, who asked the union to file grievances on their behalf, who asked the union to negotiate settlements or negotiate the last chance agreements or to represent them in their termination hearings. Mr. Alston did none of that. He instead, he went out, he got his own attorney, and he basically didn't provide the union with information. He didn't let us know when hearings were coming up. He didn't let us know when meetings were happening. He didn't provide us documentation or copies of anything. The town didn't either. So the union was kind of stuck in a few cases when the union did find out about incidents that were going on. This particular, this May 14th, this May 2014 meeting where Mr. Alston received the two day suspension, the union reached out to Mr. Alston and said, do you want the union there? And he said, yes, in that particular case. And the union showed up. And after the meeting was over, the union said, union president Rohan said to Mr. Alston, is there anything you need from us? Is there anything you want us to do? Mr. Alston said, I'll call you. He never did. He never asked us to file. So Mr. Alston says he disagreed with the provisions that were set out of that meeting. But the real, where the rubber meets the road when it comes to union activism is after the meeting, when you go up to your union rep and you say, I want to grieve that. I don't agree with that two day suspension or I don't agree with those provisions. Mr. Alston never did that. In fact, he served the two day suspension. And in fact, one of the provisions which had to do with anger management course, having to go to an anger management program. He did call the union, but he didn't call the union to complain about the provision. He called the union to find out if he had to pay the copays and the deductibles for that course or whether that was something that the town would have to pay. And the union actually did some research on that and got back to him. And ultimately, union council decided that there was no precedent for requiring the town to pay and that he would have to pay. Let me interrupt for a moment. One thing I'm not, there are a lot of things I'm not clear about yet. But one thing is your brother seems to want us to hold the union directly responsible for every statement that appears on what he refers to as the union blog, which I take it as a Facebook blog. That's right, your honor. It's actually a separate blog from Facebook. But it is. And do you agree that every statement there is the union's responsibility? I mean, how does that blog work? I do not agree. No, your honor, that that blog is accessible to every union member and that every union member has the right to put up anything they want to on that blog. What we found in this time. May I finish? Yes. What we found in this case was that Mr. Alston saw the faceless coward blog from Joe Kenny. And he went to the union president, Mr. Fay, and said, complained about it. And Mr. Fay immediately took it down. So if our position is the union, when it was alerted to problems with blog posts, it took action as required to take offensive posts off. But that it does not it did not have a system for vetting things before they went up. But if somebody had a complaint, they would take care of it. OK, thank you. That clarifies that for me. I see that my time is up. If there are no other questions, I'll rely on my brief. Thank you. Thank you, your honors. Thank you, Attorney Becker. You can mute. Attorney Schatz. Please introduce yourself on the record. And you have two minutes. Thank you. Good morning. And may it please the court. My name is Naomi Schatz representing Appelli Stanley Spiegel. With me on our briefs are Martin Rosenthal and David Duncan. We believe the lower court correctly dismissed Mr. Alston's claims against Mr. Spiegel. Mr. Spiegel has not come up so far in this argument precisely because the allegations against him are so minimal and attenuated from the crux of Mr. Alston's claims. The only allegation against Spiegel before this court is that on a single occasion, Mr. Spiegel told an unidentified third party that he had access to Mr. Alston's personnel file. And that she would not support Mr. Alston if she knew the quote real story contained in that file. Only two of the claims that Mr. Alston originally brought against Mr. Spiegel are at issue on this appeal. He has only argued that his First Amendment retaliation claim stated a claim and should not have been dismissed. And that his claim that Mr. Spiegel participated in a conspiracy to deprive Mr. Alston of equal protection stated a claim that should not have been dismissed. In dismissing Mr. Alston's First Amendment complaint, the magistrate judge correctly noted that Mr. Spiegel's brief comment was quote innocuous. Moreover, Mr. Alston did not plead that this comment had any impact whatsoever on him. Much less an impact that rises to the level of a civil rights violation under any of the statutes Mr. Alston pleaded against Mr. Spiegel. In our briefing, we have pointed to six or seven deficiencies in the complaint, each of which is fatal to Alston's claims against Spiegel. But this court need go no further than the question of qualified immunity to uphold the district court's decision. Mr. Alston has waived any argument that Mr. Spiegel is not entitled to qualified immunity by failing to address it in his brief. That in and of itself should end these claims against Mr. Spiegel. But in addition, the fact that Mr. Alston admits to this court in the companion sanctions case number 21-435, that his argument for liability requires this court to extend existing case law, is an admission that Mr. Spiegel's actions did not violate any existing clearly established case law. I believe my time is up. I don't know if there are any questions from the court. No, thank you. Thank you. Thank you, Attorney Schatz. You can mute your device at this time. Attorney Ames for rebuttal, please reintroduce yourself for the record. Attorney Ames. Sorry, Brooks Ames for Gerald Alston. The one point I'd like to leave on has to do with why was Mr. Alston terminated? And the argument that I heard from the town is he was terminated for failing to comply with conditions. But it has to be clear that Mr. Alston was not terminated because he violated some drug policy, for example, of the town of Brookline. The town of Brookline does not terminate for use of drugs. There's evidence on the record that when Mr. Alston was brought before a disciplinary hearing internal to the town. They had of drugs. They did not terminate him. He received a warning. So there was not a this is not a termination for drug use. It's not a termination for making threatening statements. And Mr. Alston was not terminated for making threatening statements. You got a two day suspension for that. So the issue really boils down to why did Mr. Alston have to see a psychiatrist and take in your management in order to return to work? The reason, according to the town, was that Mr. Alston was failing to cope with this backlash and and the aftermath and the continuing retaliation by Lieutenant Pender, who was promoted all the way up to interim deputy chief of the department, that it was Mr. Alston's responsibility to accommodate and deal with that environment. The important finding, the key finding of the Civil Service Commission was that the town was responsible for that environment. And effectively, it couldn't poison the workplace against firefighter Alston and then fire him because he couldn't tolerate that environment. So the true reason that he was terminated was the misconduct of the town, the accident missions of the town that made the workplace intolerable for him to return to. And the hiding behind the expert's report and the hiding behind an outside hearing officer doesn't work. And it was exposed in the attendee in front of the commission because there were many facts that came out that had not been provided. Town of Brookline that were in the sole custody of Brookline. Those facts were not provided to the expert, were not provided to the outside hearing officer. And Mr. Alston didn't have possession of them because discovery hadn't begun in this case. So it was a misleading picture. Thank you, Mr. Ames. Unless my colleagues have some questions, your time is up. Thank you, Your Honors. Thank you. That concludes the argument in this case.